# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Jerry Vandiver, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 14 CV 50048 |
| ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jerry Vandiver brings this action under 42 U.S.C. §405(g), seeking remand of the decision denying him social security disability benefits.

## BACKGROUND

On February 11, 2011, plaintiff filed an application for child's insurance benefits based on disability and supplemental security income. He was 22 years old and had filed several prior unsuccessful applications. He graduated from high school with help from special education services. He has only worked sporadically, for a month as a forklift operator in 2007 and a month as a greeter at a thrift store in 2009. R. 1005. From age 13 to 18, he and his siblings were wards of the state. They were taken from their mother because she physically abused them. In 2007, she committed suicide. Their father was in jail during this time.

On July 31, 2012, a hearing was held before the administrative law judge ("ALJ"). Plaintiff testified that he could not work because he was "unstable" and had schizophrenia and could not do even little tasks or handle a stressful environment. R. 34. Plaintiff was then living with friends where he had been for two months. Before then, he lived with his cousin but had a big dispute when he could not do simple tasks around the house. Plaintiff has a girlfriend and

1

spends most of his time playing computer games online. He has done some volunteer work online, such as making a web page, but has not been paid for it.

From roughly 2006 until 2012, plaintiff was seen by a series of counselors and therapists. The following facts are taken from the ALJ's opinion. Plaintiff was evaluated by a school psychologist Michael Fratello sometime around 2006. He saw an unnamed counselor at the Youth Services Network at some unspecified point. Carol O'Haron at the Mildred Berry Center, identified by the ALJ as plaintiff's "long-term" therapist, saw plaintiff in February 2008 and perhaps at other times. In June 2009, plaintiff saw C. Shaw-Moyado, a therapist at the Janet Wattles Center. Further therapy was provided by Janet Wattles personnel in March 2011. In January 2012, plaintiff "initiated a third round of Janet Wattles-Rosecrance therapy." R. 19. There, he saw psychiatrist Dr. Shahina Jafry. R. 1041.

From 2008 until 2011, plaintiff had three consultative psychological examinations: one on May 19, 2008 (Ex. 6F), one on August 4, 2009 (Ex. 10F); and one on March 29, 2011 (Ex. 16F). These were all done by Psychology Consultants, PC, a company headed by psychologist John L. Peggau.[1] Each time a report was prepared setting forth observations, test results, diagnoses, and a GAF rating. These reports are central to the ALJ's opinion. For reasons explained below, they will be referred to by the unwieldy moniker "Peggau-office reports."

On September 28, 2012, the ALJ found plaintiff not disabled. The ALJ concluded that plaintiff had severe impairments of borderline intellectual functioning, attention deficit hyperactivity disorder, history of seizures, post-traumatic stress disorder with dissociative states, and schizoaffective disorder.[2] The ALJ found that plaintiff did not meet any Section 12 mental health listing because he only had mild limitations in the activities of dialing living and moderate

---

[1] The latter assertion is based solely on the fact that Dr. Peggau's name is listed under the letterhead.
[2] Neither the ALJ, nor the parties, have claimed that schizophrenia and schizoaffective disorder differ in any way relevant to this case. Therefore, for purposes of this opinion, the Court will assume they are roughly interchangeable.

restrictions in social functioning and concentration, persistence or pace. In the residual functional capacity ("RFC") analysis, the ALJ found that plaintiff had the ability to perform the full range of work, with the only relevant limitation that he was limited to simple work not involving public contact. The ALJ relied heavily on the Peggau-office reports in reaching this conclusion.

**DISCUSSION**

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

Plaintiff raises several overlapping arguments, which he has grouped into three categories: (1) the ALJ incorrectly applied Listing 12.03 for schizophrenia; (2) the ALJ improperly weighed the medical opinions; and (3) the ALJ improperly analyzed plaintiff's RFC. The Court finds that a remand is warranted based on the second argument.

Plaintiff raises two complaints about the ALJ's handling of the medical opinions. First, plaintiff contends that the ALJ wrongly gave controlling weight to the Peggau-office reports. Second, plaintiff contends that the ALJ failed to give weight to the medical opinions in the Janet Wattles Center (Rosecrance)[3] records from 2012, specifically the opinions of Dr. Jafry. Plaintiff cites to Seventh Circuit cases holding that controlling weight should be given to a treating

---
[3] The Janet Wattles Center became affiliated with Rosecrance during plaintiff's treatment.

3

physician's opinion, thus invoking the treating physician's rule. This argument occupies less than a page in his opening brief.

Although the argument is not especially well-developed, the Court finds that it is still warrants a remand. The treating physician rule is a key rule in disability cases. It directs the ALJ to "consider *all*" of the following factors in weighing *any* medical opinion: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors supporting or contradicting the opinion. 20 C.F.R. § 404.1527(c). These "checklist factors" are designed to help the ALJ "decide how much weight to give to the treating physician's evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). But within the weighing process, a treating physician opinion receives particular consideration. It is entitled to "controlling weight" if it is (i) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and if it is (ii) "not inconsistent with the other substantial evidence in [the] case." *Id.* If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it, but must proceed to the second step and determine what specific weight it should be given by using the checklist. *Moss v. Astrue¸* 555 F.3d 556, 561 (7th Cir. 2009). In sum, the treating physician rule establishes a two-step process.

Here, the ALJ did not comply with the agency's own regulations or the case law interpreting those regulations. The ALJ did not conduct the two-step analysis or anything close to it. He never identified whether there were any treating physician opinions, and so did not consider whether they deserved controlling or some other weight. Accordingly, he never considered plaintiff's argument that Dr. Jafry's diagnoses deserved greater consideration because

she was a treating physician in contrast to the Peggau-office reports that were based on consultative examinations, deemed lower on the hierarchical scale than treating physician opinions. The ALJ also never explicitly applied the checklist, either to the Peggau-office reports he relied on, or to the other doctors whose opinions he implicitly gave lesser weight. Instead, he employed a narrative format, summarizing the medical visits in chronological order while providing only sporadic commentary.

The only explicit analysis the ALJ provided was devoted solely to the Peggau-office reports. This analysis, discussed below, is itself flawed but at least it constituted *some* analysis. Although the ALJ did not explicitly apply the checklist, he did at least provide a reason for crediting these reports, stating as his main rationale that they were more credible because they offered a longitudinal view of plaintiff's condition from age 19 to 22. The reference to the longitudinal picture nods towards the first and second checklist factors. The ALJ also noted that the Peggau-office consultants had "training," again nodding (albeit in only the vaguest manner) to another factor, degree of specialization. Thus, a very thin argument could be made that the ALJ at least *implicitly* analyzed the checklist factors. This Court takes the view that an explicit analysis is still required. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015). But even if the Court allowed an implicit analysis, the ALJ failed to properly apply the checklist. *See Koelling v. Colvin,* 2015 U.S. Dist. LEXIS 14074, *28-29 (N.D. Ill. Oct. 16, 2015).

Nevertheless, the ALJ's approach is still flawed because he failed to use these same metrics, and employ this same level of rigor, in evaluating the other medical opinions. For example, he did not consider the length and frequency of treatment, nor the degree of specialization, of psychologist Fratello, therapist O'Haron, therapist C. Shaw-Moyado, and

5

psychiatrist Jafry. In this Court's view, the checklist has its greatest usefulness as a tool for making an apples-to-apples comparison between opinions. Accordingly, vague terms such as "longitudinal" and "long-term," terms the ALJ used here, are less helpful unless they are also accompanied by a more specific designations, such as "three consultations in a three-year period."[4] In sum, a remand is warranted based on the treating physician's rule.

Even if this Court ignored the failure to use the checklist and simply considered the ALJ's rationale for relying on the Peggau-office reports, the Court would still find a remand was warranted. The main problem, as plaintiff argues, is that the ALJ erroneously believed that all three reports were done by the same person—psychologist John L. Peggau—when he actually only prepared the first one, with the last two being prepared by psychologist Kelly Renzi, who worked in the same office. This is why the Court used the label "Peggau-office reports" rather than referring to Dr. Peggau individually as the ALJ did. The ALJ's mistaken belief is not trivial because a central rationale in his opinion was that Dr. Peggau's opinions were more trustworthy because he made a longitudinal assessment over a three-year period. Indeed, this error undermines the entire rationale for the agency's treating physician rule as well as the checklist. The longitudinal argument was mentioned three times. First, in the listing analysis, the ALJ stated: "Unlike the psychologist whom the claimant relies upon[,] Dr. Peggau saw the claimant on three separate occasions and at three ages, 19, 20 and 22, respectively." R. 15. Second, in the RFC analysis, the ALJ stated: "Given that [Dr. Peggau] saw the claimant over time, his longitudinal familiarity and training merit the assignment of substantial weight." R. 18. Third, at the end of the RFC analysis, the ALJ again made the point: "Given his training and the opportunities he had to view the claimant over time, it seems that Dr. Peggau's most recent

---

[4] The same criticism could apply to plaintiff's arguments as he has not clearly spelled out how often and how long he saw Dr. Jafry.

6

evaluation merits the greatest weight." R. 19. Standing alone, this fundamental and critical factual error is a basis for remand. *Anderson v. Colvin*, 2013 U.S. Dist. LEXIS 54206, *6 (N.D. Ind. Apr. 15, 2013) ("Straight factual errors like this obviously cannot stand . . ."); *see also Parrish v. Colvin,* 2014 U.S. Dist. LEXIS 13669, *34-36 (E.D. Va. Jan. 8, 2014) (*citing, among other cases, Walters v. Astrue,* 444 F. App'x 913, 919 (7th Cir. 2011)).

A quick and uncareful review of these reports might lead one to assume they were all written by Dr. Peggau. They all use the same format and contain the same letterhead featuring Dr. Peggau's name prominently at the top. However, a proper examination makes it clear they were prepared by different psychologists. For one thing, the signature pages confirm that Dr. Peggau prepared only the first report. The fact that there were two different evaluators might be less of a concern if there were evidence that the second evaluator read and considered the earlier reports. But there is no such evidence. The second and third reports contain no references to the earlier ones, as one would expect if the reviewer were taking a longitudinal perspective. So a question remains as to whether Dr. Renzi was aware of Dr. Peggau's earlier report or even her own earlier report when she prepared the critical third report.

Substantively, the reports do not appear to be part of an ongoing integrated assessment, as the ALJ assumed, because they contain arguably inconsistent conclusions. Specifically, Dr. Peggau's first report is at odds with Dr. Renzi's third report, and Dr. Renzi's second report could even be viewed as in conflict with her third report. To summarize, in May 2008, Dr. Peggau diagnosed plaintiff as having schizoaffective disorder with a GAF of 45. In August 2009, Dr. Renzi also diagnosed plaintiff with schizoaffective disorder and also rated his GAF of 45. So far, so good. These two reports are consistent. But a new and conflicting assessment emerges with the third report. In March 2011, Dr. Renzi concluded that plaintiff did not meet the criteria for

schizophrenia, although she found that he did meet the criteria for a new disorder (intermittent explosive disorder). She also assessed his GAF as 58, significantly higher than the two earlier 45 ratings. The third report could thus be seen an outlier from the first two. At this point, there is no way to know.

However, the ALJ placed the most weight on this report and its new diagnosis that plaintiff did not have schizophrenia. The ALJ referred to this fact twice, first in the listing analysis: "Dr. Peggau, a trained clinician, omitted specifically diagnosing schizophrenia, acknowledging at one point that it had been formulated, but it appeared in remission."[5] R. 15. The ALJ referred to it a second time in the RFC analysis, this time putting the sentence in bold so that its significance would not be missed: "**[Plaintiff] was not psychotic, and Dr. Peggau omitted schizophrenia as a diagnosis formulation.**" R. 18. The impression created is that Dr. Peggau, after seeing plaintiff multiple times and after sifting through conflicting evidence, finally settled on a clear diagnosis, which is that plaintiff never had schizophrenia or perhaps was getting better.

The ALJ's heavy reliance on the third report raises two concerns. First, as noted above, this report is not consistent with the other medical assessments, including those of Dr. Peggau and Dr. Jafry, who diagnosed plaintiff with some version of schizophrenia. This fact undermines the ALJ's claim that the Peggau-office reports were the most "consistent" evaluations. Second, neither the ALJ, nor Dr. Renzi, provided an explanation for the apparent about-face from the second to the third reports. Both reports describe the same basic symptoms of hearing voices and having anger episodes. Why then was the bottom-line diagnosis and GAF score so different? It is possible that Dr. Renzi believed that plaintiff's symptoms were improving, perhaps with better

---

[5] This quotation by the ALJ is actually a mashup of two reports. The "in remission" reference comes from the first report by Dr. Peggau while the "omitting diagnosing schizophrenia" reference comes from the third report by Dr. Renzi. R. 822, 969.

8

treatment. The ALJ hinted at this explanation when he referred to plaintiff's schizophrenia being characterized at one point as "in remission" and to plaintiff's hallucinations occurring "only" three times a week. But Dr. Renzi herself did not explicitly adopt this theory. The ALJ was playing doctor in making this determination without a medical opinion to support it. *See Engstrand v. Colvin,* 788 F.3d 655, 660-61 (7th Cir. 2015); *Goins v. Colvin,* 764 F.3d 677, 680 (7th Cir. 2014). It is possible that the ALJ's intuition about improvement may pan out under a more rigorous analysis; for now, it remains unsubstantiated. This issue ties into plaintiff's argument that the ALJ failed to consider Dr. Jafry's 45 GAF rating made in early 2012 (*i.e.* after the third report by Dr. Renzi). This evidence could be relied on to undermine the improvement rationale by showing that the 58 GAF in the third report was only a temporary upswing rather than the start of a more permanent improvement.

Beside the problems with failing to comply with the treating physician rule, the ALJ's analysis leaves two other questions not fully resolved. First, did the ALJ conclude that plaintiff had some form of schizophrenia? Although the ALJ relied on Dr. Renzi's report that plaintiff did not, the ALJ at the same time found that schizoaffective disorder was a severe impairment at step two. This discrepancy requires greater explanation. Second, putting aside the higher-level question of whether plaintiff had schizophrenia or intermittent explosive disorder or even some other disorder, what was the ALJ's view of plaintiff's underlying symptoms? These issues are critical for the RFC analysis. In the opinion, the ALJ summarized these symptoms:

> The claimant testified that he is unable to work because he cannot remember to complete simple tasks without constant reminders, or tolerate stress, and that he is subject to hallucinations. He has unpredictable episodes of anger, during which he reportedly "blacks out" and destroys things.

R. 16. It is not clear how the ALJ accounted for these symptoms. Did he find that they were not as severe as summarized above? The ALJ's decision does not provide a consistent answer and

9

contains only passing and vague references to plaintiff's credibility. Or did the ALJ believe that these symptoms were essentially benign such that they would not get in the way of him performing adequately in a full-time job? On remand, the ALJ must address each of these symptoms and should consider calling a medical expert in addition to brushing up on the fundamental principles of the treating physician rule.

The Court finds that a remand is justified on the above grounds and will thus only briefly address the remaining arguments. Plaintiff argues that the ALJ cherry-picked GAF scores by emphasizing when they fell in the moderate range on the GAF scale (51 to 60) and by downplaying them when they fell in the serious range (41 to 50). This argument dovetails with the argument above; namely, that the ALJ selectively relied on the Peggau-office reports. The GAF assessments are intertwined with those opinions. Therefore, the same concerns set forth above apply here. On remand, if the ALJ is going to rely on GAF scores, he should do so in a consistent way. *See Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (it is improper for the ALJ to "seize upon" a GAF "high-water" mark of 60 while ignoring other lower scores).

Finally, plaintiff complains that the ALJ incorrectly analyzed whether he met Listing 12.03 (schizophrenia). Plaintiff argues that the ALJ misapplied the paragraph A criteria, which refers to a "documented persistence" of hallucinations, among other things. This Court agrees that the ALJ glossed over this first step. However, as the Government points out, even if the ALJ had found that plaintiff met the paragraph A criteria, the result would not have been different because the ALJ found that plaintiff did not meet the paragraph B criteria. Because plaintiff did not specifically address this argument in his reply brief, the Court would not remand on this ground. Still, it is possible that the ALJ's mistaken assumptions regarding the medical opinions

also affected his assessment of the paragraph B criteria. Therefore, on remand the ALJ should specifically consider all of the criteria of Listing 12.03.

Indeed, the Court notes that the ALJ's order contains the erroneous, standard boilerplate paragraph regarding the criteria contained in paragraph B; namely, the following: "Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting at least 2 weeks." R. 14. Notably absent from this stock paragraph is an important component to the regulations. The regulations also provide the following: "If you have experienced more frequent episodes of shorter duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00. This alternative method of determining "repeated episodes of decompensation, each of extended duration" can be critical under certain circumstances. *See, e.g., Koelling*, 2015 U.S. Dist. LEXIS 140754 at *17-18. The ALJ should consider this method as well if it is applicable. Moreover, the agency should consider revising its stock paragraph to be consistent with its own regulations.

In remanding this case, this Court is not suggesting that the ALJ reach a particular conclusion. *Moore v. Colvin,* 743 F.3d 1118, 1129 (7th Cir. 2014). The Court recognizes that there is conflicting evidence and also that assessment of mental health conditions such as schizophrenia is often difficult. But this is all the more reason why it is important to consistently and properly apply the treating physician rule, as well as other applicable regulations and case law.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted; the government's motion is denied; and the decision of the ALJ is remanded for further consideration.

Date: December 7, 2015          By: _____
                                    Iain D. Johnston
                                    United States Magistrate Judge